AGENCY RENT–A–CAR, INC.,
Plaintiff, Appellee,

v.

Michael J. CONNOLLY, etc., et al.,
Defendants, Appellees.

Spencer Companies, Inc., Defendant,
Appellant.

AGENCY RENT–A–CAR, INC.,
Plaintiff, Appellee,

v.

Michael J. CONNOLLY, etc., et al.,
Defendants, Appellants.

Nos. 82–1337, 82–1338.

United States Court of Appeals,
First Circuit.

Argued May 7, 1982.

Decided Aug. 16, 1982.

David W. Walker, with whom Sandra L. Lynch, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for defendant, appellant Spencer Companies, Inc.

Paul W. Johnson, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and Carolyn V. Wood, Asst. Atty. Gen., Boston, Mass., were on brief, for defendants, appellants Connolly, Unger and Bellotti.

Joshua M. Berman, with whom David L. Engel, and Berman, Dittmar & Engel, P. C., Boston, Mass., were on brief, for plaintiff, appellee Agency Rent-A-Car, Inc.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is an appeal from a preliminary injunction entered by the district court, 542 F.Supp. 231, enjoining officials of the Commonwealth of Massachusetts from enforcing provisions of the Massachusetts takeover statute, Mass.Gen.Laws ch. 110C (as amended by 1981 Mass.Acts ch. 508), against plaintiff Agency Rent-A-Car, Inc., so as to prevent Agency from making a tender offer for shares of defendant Spencer Companies, Inc. The court ruled that the relevant provisions of the state statute were preempted by the federal Williams Act, 82 Stat. 454 (1968), Securities Exchange Act of 1934 §§ 12(i), 13(d, e), 14(d–f), *codified at* 15 U.S.C. §§ 78*l*(i), 78m(d, e), 78n(d–f) [citations will be to sections of the Securities Act]. For reasons we shall discuss, we do not believe it sufficiently probable that the Massachusetts statute was preempted to warrant the issuance of preliminary relief. Since this case was argued, however, the Supreme Court has over-

turned an Illinois take-over statute on the ground it violated the commerce clause. *See Edgar v. MITE Corp.*, —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Though raised below, that ground was not addressed by the district court in the present case. We therefore remand for consideration of whether preliminary relief is warranted on that ground.

*Factual and Procedural Background*

Agency initially began buying shares of Spencer early in 1981. By the end of March, it owned at least five percent of Spencer's outstanding shares and was therefore required to file a Schedule 13D disclosure statement pursuant to section 13(d) of the Securities Act and regulations thereunder. Agency filed its first Schedule 13D on March 31, 1981. It subsequently filed several amended schedules. Through open market purchases and privately negotiated transactions, Agency acquired 28 percent of Spencer's shares by the middle of August 1981. A state administrative proceeding—"*Spencer I*"—determined on August 12 that these acquisitions did not constitute a tender offer under the Massachusetts statute ("Chapter 110C").

Agency continued to purchase Spencer stock. By November 13, 1981, it had acquired over 700,000 shares, just over 38 percent of those outstanding. On that date, amendments to Chapter 110C became effective which, *inter alia*, changed the definition of "take-over bid" so as to encompass open market and private transactions as well as tender offers. *Compare* Mass.Gen. Laws ch. 110C, § 1 (before amendment) *with* 1981 Mass.Acts ch. 508, § 1 (amending Chapter 110C). Agency has since made no further purchases of Spencer stock.

On January 27, 1982, Agency announced a cash tender offer for up to 250,000 shares of Spencer stock at $15 per share (if the offer were completely successful, Agency would acquire a majority interest in Spencer). The Massachusetts Securities Division ("the Division") issued a temporary cease and desist order on January 28, and sched-

uled a hearing for February 1. Hearings before the Division began on that date, with subsequent delays in order to accommodate counsel for both sides. On March 19, 1982, the Division issued its opinion, findings and order, captioned "*Spencer II*." At the conclusion of its 35-page opinion, the Division ordered that Agency cease and desist from acquiring Spencer shares pursuant to a take-over bid until November 14, 1982. This one-year prohibition from the last date of purchase was premised on a violation of section 3 of Chapter 110C, which will be discussed below. The Division further ordered that Agency cease and desist from making a take-over bid for Spencer, without limitation as to time. This latter prohibition was based on a finding that Agency had violated section 7 of Chapter 110C, also discussed below. Agency did not seek review of these orders in the state courts. *See generally* Mass.Gen.Laws ch. 30A, § 14.

Agency filed its complaint in federal district court on January 26, 1982, the day before the announcement of its tender offer. After the Division's March 19 order, Agency moved for a preliminary injunction against the enforcement of that order. Oral argument was had on March 30; no evidentiary hearing was held. On April 12, the district court granted the preliminary injunction. This court has stayed the district court's order pending appeal.[1]

*The Massachusetts Take-Over Statute*

■ It is necessary to understand the provisions of Chapter 110C in order to assess Agency's claim that sections 3 and 7 are preempted by the Williams Act. *See generally Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971). The statute regulates certain acquisitions of shares of any "target company," which is a corporation "organized under the laws of or having its principal place of business in the commonwealth." Chapter 110C, § 2 (all citations will be to the statute as amended, unless otherwise noted). Spencer meets both of these criteria. The

---

1. There is one other proceeding arising out of these facts: Spencer has brought an action against Agency in federal court, alleging violations of the Williams Act.

statute's basic concern is with "take-over bids," which are defined, with exceptions not here relevant, as

the acquisition of or offer to acquire, whether by a formal public announcement, by a tender offer or request or invitation for tenders, by the accumulation of stock in the market or the solicitation of particular shareholders, or otherwise any equity security of a target company if, after acquisition thereof, the offeror . . . would be directly or indirectly the beneficial owner[ ] of more than ten percent of any class of the issued and outstanding equity securities of such target company. . . .

Chapter 110C, § 1. Thus, any purchase or offer to purchase shares is a regulated take-over bid if after the purchase, the shareholder would be over the ten percent ownership level. By definition, then, any further acquisition by one who already is a ten percent shareholder comes within the scope of a take-over bid.[2]

Two provisions of the statute are challenged by Agency: section 3, "on its face and as applied"; and section 7, as made operative by sections 2 and 6, "insofar as they prohibit Agency from making its tender offer." No other provisions of Chapter 110C are challenged. By virtue of its severability clause, § 13, only the challenged sections need be addressed.

Section 3 provides as follows:

No offeror shall make a take-over bid if he and his associates and affiliates are directly or indirectly the beneficial owners of five per cent or more of the issued and outstanding equity securities of any class of the target company, any of which were purchased within one year before the proposed take-over bid, and the offeror, before making any such purchase, or before the thirtieth day following the effective date of this section, whichever is later, failed to publicly announce his intention to gain control of the target company, or otherwise failed to make fair, full and effective disclosure of such intention to the persons from whom he acquired such securities.

As interpreted by the Division in *Spencer II*,[3] section 3 mandates that a five percent shareholder[4] cannot make a take-over bid if, within the last twelve months, he purchased any shares—even before reaching five percent ownership—without disclosing an intention to gain control if such existed. The prohibition runs from the date of the last purchase. Since any purchase by a ten percent shareholder is a take-over bid, *supra*, such a shareholder who has violated section 3 is barred from making any subsequent purchases for one year, unless he comes within one of the exceptions, *see, e.g.*, note 2, *supra*. The Division found that Agency had made purchases of Spencer stock without disclosing its contemporaneous intent to gain control,[5] and therefore ordered that it not make a take-over bid until November 14, 1982, one year from its last purchase of Spencer stock.

Section 7 of Chapter 110C provides first that ·

**2.** There is, *inter alia*, an exception for acquisitions of less than two percent of the shares within a twelve-month period. Chapter 110C, § 1.

**3.** There is some language in *Spencer II* suggesting that section 3 requires not only the disclosure of a definite intent to gain control of the target, but also of a conditional intent to gain control as one of several alternative plans. Other parts of the opinion, however, make it clear that Agency was held to be in violation of section 3 because of an actual undisclosed intention to gain control of Spencer. Thus, Agency could not complain that section 3's disclosure requirements were too broad, since it was found to have violated them even on a more narrow interpretation. Resolution of this

possible ambiguity is in any event not necessary for our present purposes, as Agency does not argue that the disclosure requirements in themselves are preempted.

**4.** The statute is perhaps arguably ambiguous as to whether a take-over bid may successfully be launched from a position of less than five percent ownership, or whether even if it is launched from such a starting point, it will be halted once the five percent level is reached. This question of interpretation is not germane to any issue now before us.

**5.** Agency does not challenge any of the Division's factual findings.

It is unlawful for any offeror or target company or any affiliate or associate of an offeror or target company to make any untrue statement of a material fact or to conceal any material fact in order to make the statements misleading, or to engage in any fraudulent, evasive, deceptive, manipulative or grossly unfair practices in connection with a take-over bid. It then goes on to specify that "[n]o take-over bid shall be made unless it is made under the provisions of" Chapter 110C. Under section 6, if "the [state] secretary [or his delegate] finds the take-over bid is in violation of this chapter . . . he shall so adjudicate." Under section 2, a take-over bid is deemed in compliance with the statute upon the secretary's adjudication that there are no violations. The Division interpreted sections 2 and 6 to "mandate an adjudication as to whether a take-over bid is in violation of the Act," judging the bid against "all pertinent provisions." *Spencer II*, at 29. It further stated that a finding of a violation of section 7 "necessitates an adjudication under Sections 2 and 6 that the take-over bid cannot go forward." *Id.*

The Division found Agency's conduct to be "evasive, deceptive and grossly unfair," *id.* at 32, relying primarily on Agency's failure to disclose its true intentions with respect to Spencer. It therefore adjudicated that the take-over bid was in violation of Chapter 110C, and accordingly issued a further cease and desist order, without time limitation, enjoining Agency from making a take-over bid for Spencer.

*The Williams Act*

We turn next to the Williams Act, the federal statute which allegedly preempts the state law described above. The Williams Act regulates tender offers and other take-over bids in two ways: first, by requiring disclosure of information about any five percent shareholder, Securities Act § 13(d), or tender offeror, *id.* § 14(d), and second, by giving shareholders of the target of a tender offer certain substantive protections, such as withdrawal and proration rights, *id.* There is also a prohibition of fraudulent and deceptive practices in connection with

tender offers, *id.* § 14(e), similar to that of Chapter 110C's § 7.

No private cause of action is expressly created by the Williams Act. Courts have found and enforced an implied private equitable remedy, generally in favor of the target corporation and its shareholders against an offeror who made an improper tender offer. The traditional equitable prerequisites to injunctive relief are required. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975). Thus, injunctions may not be granted simply by showing a violation of the Act: there must also be irreparable harm, and the injunction must be tailored to fit the circumstances of the particular case. *Id.*

In *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), the Court stated that "[t]he legislative history . . . shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." While the importance of neutrality—neither encouraging nor discouraging tender offers, by not favoring either the target's management or the bidder—was recognized, this was viewed by the Court essentially only as a means to the end of investor protection. *See id.* at 29, 97 S.Ct. at 943. The congressional purpose, as described in *Piper*, is to protect investors by ensuring that they be given the relevant information and then allowing them to make their own decisions on tender offers.

*Piper* presented the question of whether an unsuccessful bidder has an implied cause of action under the Williams Act. In a recent case involving preemption of a state take-over statute, *Edgar v. MITE Corp.*, —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), certain members of the Court emphasized the policy of neutrality. Justice White, joined by Chief Justice Burger and Justice Blackmun, stated that while "Congress intended to protect investors" in the Williams Act, "a major aspect of the effort to protect the investor was to avoid favoring either management or the take-over bidder." At ——, 102 S.Ct. at 2636.

Thus, Congress "expressly embraced a policy of neutrality" and "intended to strike a balance between the investor, management and the takeover bidder." *Id.* The importance of this policy in the preemption context is that state statutes must not give target management "any undue advantage that could frustrate the exercise of informed choice" by investors. *Id.* The bidder is required to furnish adequate information, and the incumbent management is to be given " 'an opportunity to express and explain its position,' " *id., quoting Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975), but afterwards, the offeror "should be free to move forward within the time-frame provided by Congress." —— U.S. at ——, 102 S.Ct. at 2637.

*Edgar* was actually decided by the Court on commerce clause grounds, *see infra* pages 1039–1040, as Justice White's discussion of preemption did not command a majority of the Court. Justice Stevens, concurring in part and concurring in the judgment, apparently accepted the view that the Williams Act evinced a policy of neutrality. *See* at ——, 102 S.Ct. at 2648. Nonetheless, he did not think that such a policy "is tantamount to a federal prohibition against state legislation designed to provide special protection for incumbent management." *Id.* Justice Powell, concurring in part, also accepted the neutrality view, but

> agree[d] with Justice Stevens that the Williams Act's neutrality policy does not necessarily imply a congressional intent to prohibit state legislation designed to assure—at least in some circumstances— greater protection to interests that include but often are broader than those of incumbent management.

*Id.* at ——, 102 S.Ct. at 2643. No other Justices reached the preemption issue in any way. *See id.* at ——, 102 S.Ct. at 2643 (O'Connor, J., concurring in part); *id.* (Marshall, J., joined by Brennan, J., dissenting); *id.* at ——, 102 S.Ct. at 2652 (Rehnquist, J., dissenting).

### The Preliminary Injunction Standard

█ The plaintiff's burden in obtaining preliminary relief is clear:

> "In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction."

*Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981), *quoting Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979). Our standard of review is well-settled as to whether the district court has abused its discretion. *E.g., Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

> "It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion."

*Id.; Planned Parenthood*, 641 F.2d at 1009, both *quoting Charles v. Carey*, 627 F.2d 772, 776 (7th Cir. 1980).

With these standards in mind, we proceed to a review of the grant of a preliminary injunction in this case. While our primary focus will be on the merits of Agency's preemption claims, we note now without repetition later that because of the posture of the case, our discussion of course must be understood as reflecting only our views on the probable final outcome of the case, and is not a definitive holding on the issues presented. *See Planned Parenthood*, 641 F.2d at 1009.

### The District Court's Opinion

While citing to the other prerequisites for preliminary injunctive relief, the district

court focused almost exclusively on only one factor: Agency's likelihood of success on the merits of its preemption claim.[6] In finding section 3 invalid on its face, the court stated that the automatic sanction imposed for violations—a one-year delay— benefited not shareholders but target management, and thereby "operates at cross-purposes" to the Williams Act.[7] As noted *supra*, the court arrived at its conclusions without holding an evidentiary hearing. The court found section 7 invalid as applied because the Division relied in part on Agency's Schedule 13D filings in finding a violation of section 7. The court stated that "[t]he sufficiency of 13D filings are [sic] exclusively a matter of federal law." Memorandum and Order at 7–8. As will be noted *infra*, Agency does not now press this point. Rather, it argues that, as with section 3, it is the sanction imposed under section 7 that renders these provisions preempted by the Williams Act.

The court briefly noted its finding of irreparable harm to Agency in the Commonwealth's delay of its take-over bid for Spencer. It also cursorily stated that the public interest would be served by the preliminary injunction and that the harm to the defendants from it did not outweigh the harm to Agency if the injunction were not entered. It therefore entered the preliminary injunction that is the subject of this appeal. The district court did not pass judgment on the merits of Agency's alternative claim that the Massachusetts statute violated the commerce clause.

*Discussion: Balance of Harms and the Public Interest*

Before considering the merits of the preemption issue, we briefly examine the other factors involved in the grant of the preliminary injunction. The district court noted that the delay of Agency's tender offer constituted irreparable injury because it would afford Spencer's management time to erect a successful defense to the take-over bid. *See, e.g., Kennecott Corp. v. Smith,* 637 F.2d 181, 188 (3d Cir. 1980). There is, however, harm—perhaps irreparable—to Spencer's shareholders as well, if the tender offer were to continue and perhaps even be consummated with Agency achieving control of Spencer, should the Massachusetts statute later turn out not to be preempted. *See Telvest, Inc. v. Bradshaw,* 618 F.2d 1029, 1034 (4th Cir. 1980); *UV Industries, Inc. v. Posner,* 466 F.Supp. 1251 (D.Me.1979). Moreover, should the statute be valid, the public interest would obviously be adversely affected by a preliminary injunction enjoining its enforcement. *See Telvest,* 618 F.2d at 1036; *UV Industries,* 466 F.Supp. at 1259.

This is not to say that these factors alone would have necessitated a denial of preliminary relief. Rather, these considerations should simply serve to indicate the closeness of the question, to show that there are, even apart from the merits of the preemption issue, strong arguments against the preliminary injunction. We are not in a position to weigh these considerations for the first time: careful treatment of them by the district court would perhaps have shown a more reasoned basis for the exercise of its discretion. In the absence of such an analysis, it becomes more difficult to support that discretion.

*Discussion: Preemption*

We turn, then, to the merits and consideration of Agency's preemption argument. It is vital at the outset to distinguish this case from others involving tender offer regulation preemption issues. In *Edgar v. MITE Corp.,* —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Court held that the Illinois take-over statute was unconstitu-

---

**6.** The court did not address Agency's claim that the Massachusetts statute violates the commerce clause. This issue presents substantial questions which should be considered on remand. *See infra* page 1040.

**7.** The court also noted briefly that the Division's language concerning disclosure of alter-

native plans was broader than any disclosure required under federal law. As we have stated, *supra,* note 3, both the Division's opinion and section 3 may be ambiguous with respect to the required degree of disclosure, but this problem is not relevant to the questions now presented.

tional under the commerce clause. Justice White, joined by Chief Justice Burger and Justice Blackmun, expressed his view that the state statute was also preempted by the Williams Act. Even were this the view of a majority of the Court, it would not require that the Massachusetts law be struck down. The provisions of the Illinois act that Justice White focused on all presented far more egregious conflicts with the Williams Act than is apparent here. These provisions were a 20-day precommencement notification requirement; a hearing provision without time deadlines, which could be used by target management to produce further delay; and a provision allowing the Illinois Secretary of State to enjoin tender offers he found to be substantively unfair. *See* —— U.S. at —— – ——, 102 S.Ct. at 2635–41. The first two provisions clashed with the Williams Act by permitting delays during which target management could move to defeat the tender offer; the last provision conflicted with the Williams Act by substituting an official's judgment for that of the investors themselves. In addition to these distinguishing facts, it should be noted that two other members of the Court refused to join this part of the opinion because they had more lenient views of when state take-over statutes might survive preemption challenges. *See id.* at ——, 102 S.Ct. at 2643 (Powell, J., concurring in part); *id.* at ——, 102 S.Ct. at 2643–44 (Stevens, J., concurring in part and concurring in the judgment). *See also supra* pages 1033–1034. The remaining justices expressed no views on the preemption question. *See supra* page 1034. *Edgar* thus cannot stand for a broad preemption principle under which any state regulation of tender offers would have to be invalidated. Circuit court cases finding preemption also dealt with statutes presenting far greater conflicts with the federal law than might be the case with the Massachusetts statute. *See Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1977), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (state statute embodied "fiduciary" rather than "market" approach

to investor protection); *Kennecott Corp. v. Smith,* 637 F.2d 181 (3d Cir. 1980) (state statute had different time requirements than Williams Act).

Here, on the other hand, Agency does not challenge the disclosure, filing, or hearing requirements of Chapter 110C. Rather, in its own words, "Agency contends that the *sanction* imposed by section 3, and the *sanction* imposed by sections 2 and 6 [for violations of section 7], in the circumstances of this case, conflict with the policies of the federal Williams Act . . . ." Brief for Appellee at 8 (emphasis in original). Its argument is that the automatic delays imposed for violations of what are for purposes of this case concededly valid disclosure requirements are preempted because they go further than is necessary to protect investors, thereby tipping the scales too far in favor of target management. The defendants respond that the sanctions are a reasonable deterrent to violations and do not impermissibly conflict with federal policies.

■ In undertaking preemption analysis, it is first necessary to determine whether Congress has intended to occupy the entire field, thus rendering invalid all state regulation on the subject. *See, e.g., Hines v. Davidowitz,* 312 U.S. 52, 66–67, 61 S.Ct. 399, 403–404, 85 L.Ed. 581 (1941); Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court,* 75 Colum.L.Rev. 623, 624–25 (1975) [hereinafter cited as *Preemption Doctrine*]. No argument is made here that the Williams Act evinces such an intent, nor would one likely be successful. *See Edgar v. MITE Corp.,* —— U.S. ——, 102 S.Ct. 2629, 2633, 73 L.Ed.2d 269 (1982) (opinion of Justice White); *Telvest, Inc. v. Bradshaw,* 618 F.2d 1029, 1035 (4th Cir. 1980); Note, *Securities Law and the Constitution: State Tender Offer Statutes Reconsidered,* 88 Yale L.J. 510, 519–20 (1979); Note, *The Constitutionality of State Takeover Statutes: A Response to Great Western,* 53 N.Y.U.L.Rev. 872, 908–11 (1978); Note, *Preemption and the Constitutionality of State Tender Offer Legislation,* 54 Notre Dame Law, 725, 731

(1979).[8] Rather, in the absence of federal occupation, the test is, according to an oft-cited formulation, whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. at 67, 61 S.Ct. at 404; *see, e.g., Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. at 470, 479, 94 S.Ct. at 1879, 1885, 40 L.Ed.2d 315 (1974); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141, 83 S.Ct. 1210, 1216, 10 L.Ed.2d 248 (1963). We first examine section 3's sanction of a one-year prohibition in light of this standard.

At first glance, it might seem difficult to conceive how sanctions alone could ever be preempted. If it is permissible for the state to regulate the conduct in question, then it might seem that no conflict could be presented by state penalties for violation of the valid regulations. Such a position finds some support from *California v. Zook*, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005 (1949), where the Court upheld more serious state than federal penalties for sale of transport without an ICC permit. Nonetheless, the Court has held at least twice that sanctions may be preempted, even if the underlying state regulations are themselves proper. In *Hill v. Florida*, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945), the Court struck down a state's prohibition of a union's operation as a sanction for failing to file a report listing its officers. The Court stated,

> It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with the federally protected process of collective bargaining.... Such an obstacle to collective bargaining cannot be created consistently with the Federal Act.

*Id.* at 543, 65 S.Ct. at 1375.[9] In *Castle v. Hayes Freight Lines, Inc.*, 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68 (1954), the Court relied on *Hill* to strike down a state injunction against interstate motor carriers for violation of valid state highway regulations. *Castle* is, however, less squarely on point than *Hill*, for the Court relied also on a federal statute vesting exclusive licensing power in the ICC to support its view that the sanction was improper. We have found no other cases finding state sanctions for their valid regulations preempted. *Cf. National Union v. Arnold*, 348 U.S. 37, 46, 75 S.Ct. 92, 97, 99 L.Ed. 46 (1954) (Black, J., dissenting) (citing *Hill* for the proposition that "[s]tate punishments must not obliterate clearly granted federal rights").

It might be tempting to analogize from *Hill* to this case, finding the one-year ban of section 3 in impermissible conflict with the Williams Act. For many reasons, however, we do not find *Hill* dispositive. First, the Court has cautioned that its "prior cases on pre-emption are not precise guidelines ..., for each case turns on the peculiarities and special features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973). *See also* Note, *Preemption Doctrine*, at 652. Second, the area of labor relations (at issue in *Hill*) has proven a particularly intractable one in terms of preemption analysis, necessitating rules unique to the field. *See generally Amalgamated Association v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). In particular, preemption of remedies in labor cases often rests on the Court's perception that Congress has entrusted the NLRB with the power to interpret and enforce a uniform body of labor regulation. *See id.* at 288–89 n.5, 294, 91 S.Ct. at 1918–1919 n.5, 1921. While the Court has not reinterpreted *Hill* in light of more recent cases, *compare* its treatment of *International Union v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), in *Lockridge*, 403 U.S. at 297 & n.7, 91 S.Ct. at 1923 & n.7, the continuing per-

---

8. Like most recent scholarship, these Notes argue that state regulation of tender offers should usually not be found preempted by the Williams Act.

9. In dissent, Justice Frankfurter stated that "of course" a state "may provide appropriate sanctions" for violations of its valid regulations. *Id.* 325 U.S. at 560, 65 S.Ct. at 1382. Had that view commanded a majority, Agency's argument would have been quickly disposed of.

suasive power of *Hill*'s rationale, especially outside the labor area, is not at all clear. We have found no case since *Castle* relying on *Hill* to strike down sanctions for valid regulations.

Finally, we have recognized that Supreme Court cases of the last decade demonstrate a new solicitude toward state interests and an elevation of the threshold of conflict required before a state statute is preempted. *See Kargman v. Sullivan*, 552 F.2d 2, 10–11, *reh. denied*, 558 F.2d 612 (1st Cir. 1977). *See also* Note, *Preemption Doctrine*, at 623, 652–53. A brief survey of some of these cases will best indicate the path our analysis should follow.

In *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 248 (1973), the Court stated that the proper approach in preemption cases is to attempt to reconcile the operation of both the state and federal laws rather than completely invalidating the state law. *Id.* at 127, 94 S.Ct. at 389. Following that approach, the Court upheld a state law voiding an employee's forfeiture of pension benefits in the face of a federal securities regulation requiring arbitration. This case demonstrates that even an actual conflict with federal law will not necessarily lead to preemption. *See* Note, *Preemption Doctrine*, at 648.

In *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), the Court upheld state trade secret protection laws over the argument that they were preempted by the federal patent system. While troubled by the possibility that inventors with patentable inventions might forego patents and rely on trade secret protection—thus conflicting with the federal policy of disclosure of new discoveries—the Court did not feel this risk was significant enough to justify preemption.

This case may be interpreted as support for the proposition that leeway is to be accorded a state's choice of remedy, even when it conflicts to some degree with federal policy. Justice Douglas, in dissent, noted that his chief difficulty was not with trade secret protection *per se*, but with the grant of an injunction against disclosure rather than damages. *Id.* at 498–99, 94 S.Ct. at 1894–95. The injunction presented a far greater conflict with federal policy than would damages, but the majority upheld it nonetheless.

Other recent cases state that a mere possibility of state-federal conflict is not sufficient to justify preemption. *See, e.g., Goldstein v. California*, 412 U.S. 546, 554–55, 93 S.Ct. 2303, 2308–09, 37 L.Ed.2d 163 (1973). Moreover, there is support on the Court for acceptance of what amounts virtually to a strong presumption against preemption, based on two factors: diffusion of power to the states is said to further democracy, and a finding of no preemption is regarded as preferable because Congress can overrule it by appropriate legislation, while a finding of preemption cannot be changed by the states. *See City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 643, 93 S.Ct. 1854, 1864, 36 L.Ed.2d 547 (1973) (Rehnquist, J., dissenting).

■■ Applying the Court's conflict analysis as interpreted in these cases, we cannot say that section 3's one-year ban is preempted by the Williams Act's policy of investor protection.[10] The validity of section 3's regulation of creeping tender offers is not in itself attacked. When the prohibition does come into play, it is only after a take-over bid is made, as here, without proper disclosure. The delay imposed by section 3 does not become operative unless there has been a violation. This distinguishes Chapter

---

10. Nor do we think section 3 preempted by the policy of neutrality as between target and bidder, *see supra* pages 1033–1034. For the same reasons as discussed in text with respect to the policy of investor protection, section 3's sanction does not impermissibly tip the balance in favor of target management. It does not represent a forbidden "weapon" in the hands of the target, *compare* cases discussed *supra* at pages 1035, 1036, but rather is simply designed to ensure compliance with the disclosure provisions. And, as we have said, *see supra* page 1036, the disclosure provisions in the context of this case are assumed by the parties to be valid. While a more narrowly drawn sanction might be more neutral, the one-year ban does not appear so far out of bounds as to be preempted.

110C from other state statutes found wanting because of delays built-in for every tender offer. *See supra* pages 1035, 1036. Here, the delay is easily avoided by compliance with the statute. When compliance occurs, therefore, there is no conflict at all with the Williams Act.

█ It is true that the one-year delay may often be a more serious penalty than is necessary to protect investors from the consequences of improper disclosure in a particular situation. To that extent it may be said to conflict with federal policy. On the other hand, the deterrent effect of the sanction is obviously beneficial to investors and is therefore in keeping with federal goals.[11] Indeed, it may be that the deterrent effect is so powerful that violations can be expected only very rarely, further reducing the degree of conflict. Agency of course stresses the conflict here, where its own tender offer has been enjoined under section 3. But our analysis must have a more distant horizon in order to assess the conflict presented by these statutes. *See generally Kewanee Oil*, 416 U.S. at 479–93, 94 S.Ct. 1885–92. On the record as it now stands, any significant degree of conflict is purely speculative, and thus insufficient to justify preemption.[12]

Our approach serves to reconcile the federal and state statutes, the preferred approach under *Ware*. Leeway is given to the state's choice of remedy, as suggested by *Kewanee*. The mere possibility of a significant degree of conflict is not given controlling weight, in accord with *Goldstein*. Indeed, *Hill* itself—the strongest case in support of Agency's position—may be distinguished: neither the filing requirement nor the injunction in *Hill* were linked to protec-

tion of employees, the purpose of the federal Labor Act. The injunction thus stood on tenuous ground as interfering with federal policy without redeeming effect. Here, on the other hand, the disclosure requirements of section 3 and the deterrent effect of its one-year ban operate in general toward the same end as the federal statute: protection of investors. The conflict here is thus of a lesser degree than that condemned in *Hill*. For all these reasons, we conclude that the district court erred in finding that Agency was likely to succeed on the merits of its preemption claim with respect to section 3. We accordingly vacate its preliminary injunction—premised on the preemption claim—with respect to the Division's order under section 3.

█ With respect to section 7, and the indefinite ban imposed by the Commonwealth for Agency's violation of it, we conclude that the proper course at this time is for the federal courts to abstain from making a determination of its constitutionality. While the Division's opinion and order appear final, we are informed by the Commonwealth that the Division is free to and indeed will (if requested by Agency) re-examine its section 7 order when the section 3 order expires (November 14, 1982). It may be, as Agency argues, that the order is indeed final or that in any event Chapter 110C requires a permanent injunction for all violations of section 7. These matters are, however, best left to the state courts in the first instance before a federal determination of the constitutionality of section 7, as applied in this case. Indeed, since Agency attacks section 7 only as applied, it will be necessary to obtain a final ruling on how section 7 does apply to its conduct before a

---

**11.** Reliance on equitable remedies under the Williams Act, *see, e.g., Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), does not in itself indicate a federal policy supporting only these remedies in tender offer cases. These federal remedies are implied in the absence of explicit legislation, and thus evince the requirements of such implication, *see generally Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), and do not represent a limitation on state sanctions.

**12.** Factual development below (should Agency pursue its preemption claim with respect to final relief) may show this view to be too sanguine, and demonstrate that in actual operation section 3 may be expected to halt so many tender offers as to conflict impermissibly with the Williams Act. We are not now, however, presented with such factual support for Agency's position.

federal court can adjudicate the matter. The preliminary injunction will thus be vacated with respect to section 7 as well.

*Discussion: Commerce Clause*

Agency also argues that section 3 is invalid under the commerce clause. Although presented to it, the district court did not pass on this contention. In *Edgar v. MITE Corp.*, —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269, a case decided after appellate argument here, the Court invalidated the Illinois take-over statute on the ground that it constituted an impermissibly burdensome indirect regulation on interstate commerce under the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). —— U.S. at ——, 102 S.Ct. at 2643; *id.* (Powell, J., concurring in part); *id.* at ——, 102 S.Ct. at 2647–48 (Stevens, J., concurring in part and concurring in the judgment); *id.* (O'Connor, J., concurring in part).

While *Edgar* indicates that the constitutionality of the Massachusetts statute presents very serious and substantial questions, leaving its validity very much in doubt, we do not feel that it is appropriate for this court to decide the issue without further development of the record and without allowing the district court to perform the required balancing and exercise its discretion concerning preliminary relief in the first instance. The benefits and burdens of the Massachusetts statute are not entirely clear on the record now before us. *Cf. Florida Lime & Avocado Growers*, 373 U.S. at 152–56, 83 S.Ct. at 1222–25. Moreover, they are not necessarily identical to the benefits and burdens of the Illinois statute at issue in *Edgar.* We thus do not find that case so clearly dispositive as to make it advisable for us to decide the issue ourselves and conclude that preliminary relief would be warranted on this ground. *See generally Aman v. Handler*, 653 F.2d 41 (1st Cir. 1981) (remanding to district court for development of record and consideration of preliminary injunction under correct legal standard for the merits).

A four-member plurality in *Edgar* also thought the Illinois statute invalid as a direct restraint on interstate commerce, regardless of any balancing of benefits and burdens. —— U.S. at ——, 102 S.Ct. at 2640 (White, J., joined by Burger, C. J.); *id.* at ——, 102 S.Ct. at 2647–48 (Stevens, J.); *id.* (O'Connor, J.). While we might be able to apply this test to the Massachusetts statute without further factual development, it represents only the view of a plurality, and is not the opinion of the Court. It therefore does not in itself provide a dispositive ground for affirming the district court at this juncture.

The preliminary injunction is vacated. However, our disagreement with the district court on the close and difficult issue of preemption is in no way intended to suggest that we either favor or disfavor injunctive relief following consideration of the commerce clause issue. The case is remanded to the district court for consideration of the propriety of preliminary (and possibly final) relief premised on Agency's commerce clause claim, in light of the Supreme Court's decision in *Edgar v. MITE Corp., supra.*

*So ordered.*