August 3, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1977

FIRESIDE NISSAN, INC.,
Plaintiff-Appellant,

v.

DANIEL P. FANNING, DIRECTOR,
DEPARTMENT OF TRANSPORTATION
FOR STATE OF RHODE ISLAND, ET AL.
Defendants-Appellees.

ERRATA SHEET

The opinion of this court issued on July 20, 1994 is amended

as follows:

Page 26, line 6 should read ". . . flow are . . ." instead

of ". . . flows is . . ."

UNITED STATES COURT OF APPEALS
FOR THE FIRST CURCUIT

No. 93-1977

FIRESIDE NISSAN, INC.,

Plaintiff-Appellant,

v.

DANIEL P. FANNING, DIRECTOR,
DEPARTMENT OF TRANSPORTATION
FOR STATE OF RHODE ISLAND, ET AL.

Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, U.S. District Judge]

Before

Torruella, Circuit Judge,

Coffin, Senior Circuit Judge,

and Boudin, Circuit Judge.

Ronald W. Del Sesto, with whom Peter P. D. Leach and Updike,

Kelly, Spellacy & Del Sesto were on brief for appellant.

John J. Igliozzi, Office of the Legal Counsel, Rhode Island

Department of Transportation for appellee Department of
Transportation for State of Rhode Island.
Gerald C. DeMaria, with whom Lawrence P. McCarthy III,

Patrick B. Landers and Higgins, Cavanagh & Cooney were on brief

for appellee Nissan Motor Corporation in U.S.A.
John D. Biafore, with whom Goldman & Biafore was on brief

for appellee Nissan of Smithfield, Inc.

July 20, 1994

TORRUELLA, Circuit Judge. Rhode Island's automobile

dealership law allows existing dealers within a twenty-mile

radius of a proposed new dealership to protest the establishment

of the new dealership. The issue raised by this appeal concerns

situations in which, by reason of a proposed new dealership in

proximity to the state border, a part of that twenty-mile radius

falls outside of Rhode Island. State officials have taken the

position that within the twenty-mile area surrounding a proposed

new dealership, only the dealers who are located inside Rhode

Island's borders are covered by Rhode Island law and thus are

entitled to protest the establishment of the new dealership. A

Massachusetts car dealer who is located within the twenty-mile

radius of a proposed dealership, but in Massachusetts, claims

that this interpretation of Rhode Island law runs afoul of the

Commerce Clause because it burdens and discriminates against

interstate commerce. Because Rhode Island is merely applying its

law to those subject to its jurisdiction and regulation, rather

than extraterritorially, and because it neither burdens nor

discriminates against interstate commerce in the process, we

agree with Rhode Island and affirm.

I. BACKGROUND

Plaintiff-appellant Fireside Nissan, Inc. ("Fireside"),

a Massachusetts automobile dealer, brought this action against

the Rhode Island Department of Transportation ("RIDOT") after

RIDOT excluded Fireside from participating in hearings regarding

a proposed Nissan dealership in Rhode Island. Fireside claimed

-2-

that RIDOT's application of Rhode Island's new dealership law to

exclude Fireside merely because it was not located in Rhode

Island was unconstitutional.

Rhode Island General Laws, Section 31-5.1-4.21 sets

out certain procedural requirements for establishing a new

automobile dealership in the state. First, a manufacturer

desiring an additional dealership must notify dealers "in the

relevant market area" of its intentions. R.I. Gen. Laws 31-

5.1-4.2(a). "Relevant market area" is defined as "the area

within a radius of twenty (20) miles around an existing dealer or

the area of responsibility defined in the franchise, whichever is

greater." R.I Gen. Laws 31-5.1-1(J). Existing retail dealers

in the "relevant market area" may then protest the establishment

1 R.I. Gen. Laws 31-5.1-4.2 provides in relevant part:

(a) In the event that a manufacturer
seeks to enter into a franchise
establishing an additional new motor
vehicle dealership . . . within or into a
relevant market area where the same line
make is then represented, . . . the
manufacturer shall in writing by
certified mail first notify the
department . . . and each new motor
vehicle dealer in such line make in the
relevant market area . . . . [A]ny such
new motor vehicle dealership may file
with the department a protest to the
establishing or relocating of the new
motor vehicle dealership . . . . When
such a protest is filed, . . . the
manufacturer shall not establish or
relocate the proposed new motor vehicle
dealership . . . until the department
has held a hearing, nor thereafter, until
the department has determined [whether]
there is good cause for not permitting
such new motor vehicle dealership.

-3-

of the new dealership in which case RIDOT must hold a hearing to

determine if "there is good cause for not permitting" the

additional franchise. R.I. Gen. Laws 31-5.1-4.2(a). The

statute does not explicitly state whether or not the dealers who

may protest the establishment of a dealership in the "relevant

market area" must be located in Rhode Island or be a licensed

Rhode Island dealership.2

In March of 1991, Nissan Motor Corporation in U.S.A.

("Nissan USA"), gave notice to RIDOT, Fireside, and other Nissan

dealers of its intention to establish a dealership in Smithfield,

Rhode Island. Fireside, which sells and services Nissan

2 Throughout Title 31 of the Motor Vehicle Code, the term
"dealer" is defined as:

Every person engaged in the business of
buying, selling, or exchanging vehicles
of a type required to be registered
hereunder and who has an established
place of business for such purpose in

this state.

R.I. Gen. Laws 31-1-19 (emphasis added).

For purposes of the provision regarding the establishment of new
car dealerships, R.I. Gen. Laws 31-5.1-4.2, however, the right
to protest at a hearing applies to any "new motor vehicle dealer"
which is defined as:

[A]ny person engaged in the business of
selling, offering to sell, soliciting or
advertising the sale of new motor
vehicles and who holds, or held at the
time a cause of action under this chapter
accrued, a valid sales and service
agreement, franchise or contract, granted
by the manufacturer or distributor for
the retail sale of said manufacturer's or
distributor's new motor vehicles.

R.I. Gen. Laws 31-5.1-1(C).

-4-

automobiles, is located in North Attleboro, Massachusetts,

approximately two miles from the Rhode Island border and within

twenty miles of Smithfield. Fireside is therefore squarely

within the "relevant market area" of the Smithfield dealership.

Fireside is not a licensed automobile dealer in Rhode Island but

instead holds a Massachusetts dealership license.

In response to Nissan USA's notice, Fireside filed a

protest with RIDOT on April 12, 1991. Three Rhode Island dealers

of Nissan automobiles, who were also within the "relevant market

area," filed protests with RIDOT as well. On February 13, 1992,

RIDOT issued a notice to Fireside and the other dealers stating

that it was scheduling a hearing regarding the Smithfield

dealership on April 2, 1992.

At the hearing, Nissan USA moved to exclude Fireside

because it was an out-of state dealer. RIDOT, acting through the

Rhode Island Dealer's License and Regulations Office, determined

that Fireside lacked standing to participate in the hearing and

excluded Fireside from presenting witnesses or evidence at the

hearing. The three Rhode Island dealers did participate at the

hearing and presented evidence on their own behalf.

Fireside was prepared to present evidence at the

hearing showing that 48% of Fireside's sales and 45% of its

service business went to Rhode Island residents. In addition,

Fireside would have established that 100% of its cable television

advertising and 75% of its print advertising is done in Rhode

Island.

-5-

After the hearing, RIDOT determined that good cause

existed for the establishment of the Smithfield dealership.

According to R.I. Gen. Laws 31-5.1-4.2(b), RIDOT must base its

determination of "good cause" on the "existing circumstances,

including, but not limited to:"

(1) Permanency of the investment of the
existing new motor vehicle dealer(s) in
the community;

(2) Whether the new motor vehicle
dealers of the same line make in that
relevant market area are providing
adequate consumer care . . . which shall
include the adequacy of motor vehicle
sales and service facilities, equipment,
supply of motor vehicle parts, and
qualified service personnel;

(3) Whether there is reasonable evidence
that after the granting of the new motor
vehicle dealership, that [sic] the market
would support all of the dealerships of
that line make in the relevant market
area;

(4) Consequently, whether it is
injurious to the public welfare for an
additional new motor vehicle dealership
to be established.

R.I. Gen. Laws 31-5.1-4.2(b).

Upon consideration of these factors, RIDOT found cause to issue a

license to the Smithfield dealership, which is now known as

Nissan of Smithfield, Inc. ("Smithfield Nissan").

Fireside commenced this action on April 9, 1992, naming

Daniel Fanning, Director of RIDOT as the defendant. Fireside

sought a declaration that RIDOT's interpretation of Section 31-

5.1-4.2 as excluding Fireside from the new dealership hearing

violated the Commerce Clause, the Privileges and Immunities

-6-

Clause, the Due Process Clause and the Equal Protection Clause of

the United States Constitution. Fireside also sought an

injunction restraining RIDOT from precluding Fireside from

participating in future hearings as well as a temporary

restraining order and a preliminary injunction enjoining RIDOT

from granting a dealership license to Smithfield Nissan. Nissan

USA and Smithfield Nissan intervened in the action.

The district court denied Fireside's requested relief.

The court found that the exclusion of Fireside from the

dealership hearings did not violate the Commerce Clause or

otherwise violate Fireside's constitutional rights. As a result,

Fireside could not show the irreparable harm or the likelihood of

success on the merits necessary for the granting of a preliminary

injunction. The court also denied Fireside's request for a

declaratory judgment and a permanent injunction and entered a

final judgment in favor of RIDOT, Nissan USA, and Smithfield

Nissan.

II. ANALYSIS

Fireside's right to its requested relief, including the

preliminary and permanent injunctions and the declaratory

judgment, depends primarily on whether the exclusion of Fireside

from RIDOT's new dealership hearings violates the Constitution.

Before the court will grant a preliminary injunction, Fireside

must establish, among other things, that it faces a likelihood of

success on the merits and that it will suffer irreparable harm if

the injunction is not issued. Planned Parenthood League v.

-7-

Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981). Fireside alleges

that it will suffer irreparable injury from RIDOT's violation of

Fireside's constitutional rights. See National People's Action

v. Village of Wilmette, 914 F.2d 1008, 1013 (7th Cir. 1990),

cert. denied, 499 U.S. 921 (1991) (finding constitutional

violation sufficient to establish irreparable injury); Mitchell

v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (same). Likewise, the

merits of the permanent injunction and the declaratory judgment

also turn on the constitutionality of RIDOT's actions. Because

we uphold the district court's finding that RIDOT did not violate

the Commerce Clause or any of Fireside's constitutional rights,

we affirm the final judgment in favor of the defendants.

As a preliminary matter, we find it beneficial to our

constitutional inquiry to clarify the nature and purpose of the

Rhode Island new dealership statute, R.I. Gen. Laws 31-5.1-4.2.

Title 31 of Rhode Island General Laws governs state regulation of

motor and other vehicles. Chapter 5.1 of that title regulates

business practices among motor vehicle manufacturers, dealers and

distributors. The provision covering the establishment of new

automobile dealerships, R.I. Gen. Laws 31-5.1-4.2, is designed

to protect existing dealers and consumers from the detrimental

effects of aggressive franchising practices by the automobile

manufacturers whose efforts to establish excessive competing

franchises are considered to be potentially "injurious to the

public welfare" if not properly regulated. R.I. Gen. Laws 31-

5.1-4.2(b).

-8-

The district court found that the statute targeted only

activities which occur within the state of Rhode Island performed

by businesses seeking or holding Rhode Island dealership

licenses. According to the court, R.I. Gen. Laws 31-5.1-4.2

was designed to safeguard the interests of those dealers and

consumers located in Rhode Island; the Rhode Island legislature

did not intend for the statute to apply to, or for the benefit

of, out-of-state dealers such as Fireside. As a result, the

court concluded that RIDOT properly applied the statute by

excluding Fireside from the new dealership hearings.

We agree with the district court's finding on this

issue. Taking its cue from the Sixth Circuit, which interpreted

a similar Kentucky statute as excluding out-of-state dealers from

new dealership hearings, BMW Stores, Inc. v. Peugeot Motors of

Am., Inc., 860 F.2d 212 (6th Cir. 1988), the district court based

its analysis on the stated purposes and language of the statute,

the interpretation of the statute by state regulators and on

general principles of statutory construction. Because we find

the first two factors to be the relevant considerations, we

discuss them below.

Although R.I. Gen. Laws 31-5.1-4.2 does not

explicitly include or exclude out-of-state dealers, the declared

policy of the statute indicates a concern for protecting only

Rhode Island dealers and residents. As in BMW Stores, the new

dealership licensing provision is aimed at protecting "the

investment of the existing new motor vehicle dealer[s] in the

-9-

community" and safeguarding the "public welfare." R.I. Gen. Laws

31-5.1-4.2(b). BMW Stores, 860 F.2d at 215 (noting that the

declared policy of the Kentucky statute was to "preserve the

investments and properties of the citizens of this state").3

The new dealership provision is one part of a set of provisions

concerning the duties, obligations, liabilities and privileges of

licensed dealers in Rhode Island and their supplying

manufacturers. R.I. Gen. Laws. 31-5.1-1 through 31-5.1-20.

None of these duties and obligations apply to Fireside because it

is not licensed in Rhode Island. Accordingly, the privileges

that correspond to such duties and obligations do not apply to

Fireside either. The new dealership provision, with its

procedure for hearings, is simply part and parcel of Rhode

Island's regulation and licensing of local dealerships. It makes

no sense, therefore, to apply Rhode Island's comprehensive

regulatory scheme for the benefit of out-of-state dealers.

Furthermore, as in BMW Stores, state regulatory

officials have interpreted the state's new dealership statute as

3 We do not attach any significance, as does Fireside, to the
use of the word "community" in Rhode Island's statute instead of
the words "citizens of this state" in the Kentucky statute. Both
terms evidence the legislature's concern with the welfare of the
public which it is charged with protecting. Also, Fireside
incorrectly claims that the Kentucky statute differs from the
Rhode Island statute because Kentucky's does not state as a
purpose the safeguarding of the general public interest. The
Kentucky statute explicitly states that its purpose is the
promotion of "the public interest and public welfare" and
mentions as one of its concerns the provision of "convenient
consumer care," which clearly indicates the same concern for
consumers and the public as the Rhode Island statute. Ky. Rev.
Stat. Ann. 190.015; 190.047(7)(b).

-10-

applying only to in-state dealers, an interpretation that

deserves some measure of deference. BMW Stores, 860 F.2d at 215;

Gallison v. Bristol School Comm., 493 A.2d 164, 166 (R.I. 1985).

We disagree with Fireside's claim that RIDOT has not conclusively

determined whether R.I. Gen. Laws 31-5.1-4.2 applies to out-of-

state dealers. Fireside points to the fact that, prior to the

hearing for Smithfield Nissan, RIDOT promulgated proposed rules

and regulations that included a provision, Section XI, that

explicitly excluded out-of-state dealers from protesting new

dealerships and participating in hearings. The final rules and

regulations, however, were issued without adopting Section XI.

Fireside argues that the failure to adopt Section XI indicates an

intent to include out-of-state dealers in the hearings. We

disagree.

First of all, the proposed Section XI, while precluding

out-of-state dealers from cross-examining witnesses or presenting

evidence, did allow for out-of-state dealers to offer verbal or

written statements at the hearings at RIDOT's discretion. The

proposal thus could be interpreted as granting more participation

rights to out-of-state dealers than they would otherwise enjoy.

As a result, we do not know if the proposal was rejected because

it was too permissive or because it was too restrictive, i.e.,

because it removed out-of-state participation rights that RIDOT

thought out-of-state dealers should have or because it granted

new rights that RIDOT thought out-of-state dealers should not

have. RIDOT's failure to promulgate Section XI is thus

-11-

inconclusive. Secondly, RIDOT's current regulations for R.I. 31-

5.1 state that their purpose is:

(a) . . . to protect the interests of the
public when dealing with motor vehicle
dealers in Rhode Island . . . .

(b) . . . to implement the provisions of
Sections 31-5 and 31-5.1 regarding the
issuance, suspension and/or revocation of
such licenses as well as the regulation
of business practices among the

businesses seeking or holding those

licenses. (emphasis added)

This demonstrates RIDOT's intent to apply R.I. Gen. Laws 31-

5.1-4.2 only to Rhode Island dealerships. In any event, the only

evidence we have of RIDOT actually taking a stand on the specific

issue before us is RIDOT's actions in this case. RIDOT excluded

Fireside from the hearings and thereby affirmatively expressed

its interpretation of R.I. Gen. Laws 31-5.1-4.2 as barring

participation of out-of-state dealers in new dealership hearings.

Fireside maintains that certain language in the statute

expresses an intent to include Fireside in the new dealership

hearings. Fireside notes that it falls within the literal

definition of a "new motor vehicle dealer" inside the "relevant

market area" for purposes of R.I. Gen. Laws 31-5.1-4.2, because

the definition of "new motor vehicle dealer" includes "any

person" selling cars, R.I. Gen. Laws 31-5.1-1(C), and the

"relevant market area" is the area within a twenty mile radius

around an existing dealer, R.I. Gen. Laws 31-5.1-1(J). The

lack of an explicit statement that the "relevant market area"

stops at the state border does not, however, indicate that the

-12-

state affirmatively intended to include out-of-state dealers in

licensing hearings. On the contrary, the definition of "dealer"

for all of Title 31 of Rhode Island's General Laws is limited to

persons who have an established place of business "in this

state." R.I. Gen. Laws 31-1-19(a). Fireside is correct that

the definition of "new motor vehicle dealer" as used in the

licensing section at issue here, R.I. Gen. Laws 31-5.1-4.2,

does not contain this limitation. R.I. Gen. Laws 31-5.1-1(C).

However, the term "relevant market area," the other key term in

R.I. Gen. Laws 31-5.1-4.2, is defined as a twenty mile radius

"around an existing dealer," employing the general term "dealer"

from 31-1-19(a) and not "new motor vehicle dealer" from 31-5.1-

1(C). One could thus interpret R.I. Gen. Laws 31-5.1-4.2 as

granting protest rights only to Rhode Island dealerships because

only Rhode Island dealers can be in a "relevant market area."

Fireside also points to R.I. Gen. Laws 31-5.1-2 for

evidence that the licensing provision applies to out-of-state

dealers. R.I. Gen. Laws 31-5.1-2 states:

Any person who engages directly or
indirectly in purposeful contacts within
this state in connection with the
offering or advertising for sale or has
business dealings with respect to a motor
vehicle within the state shall be subject
to the provisions of this chapter and
shall be subject to the jurisdiction of
the courts of this state, upon service of
process in accordance with the provisions
of the general laws.

This provision is not a general grant of extraterritoriality but

rather an affirmation that parties who are covered by the various

-13-

substantive provisions in Chapter 5.1 of Title 31, which

regulates manufacturers, dealers and distributors, cannot escape

enforcement of those provisions by claiming they are

nonresidents. If Fireside's interpretation were adopted, the

substantive regulatory provisions in Chapter 5.1 -- for example,

those regarding fraud and breach of warranty -- would apply to

Fireside and any other dealer in any other state, an absurd

result. Notwithstanding R.I. Gen. Laws 31-5.1-2, one must

still look to the specific substantive provisions of Chapter 5.1

to see who is covered. Doing so reveals that 31-5.2 was mainly

directed toward out-of-state automobile manufacturers, rather

than dealers. A majority of the provisions in chapter 5.1 impose

explicit duties and obligations on manufacturers, all or most of

whom, presumably, are, like Nissan USA, from outside of the

state. E.g., R.I. Gen. Laws 31-5.1-4 through 31-5.1-11.

Unlike the definition of "new motor vehicle dealer" which

includes generally "any person" selling cars, R.I. Gen. Laws

31-5.1-1(C), the definition of "manufacturer" specifically

includes any person, "resident or nonresident," who makes cars.

R.I. Gen. Laws 31-5.1-1(B). Thus, the Rhode Island legislature

has clearly expressed an intent to regulate out-of-state

manufacturers when they do business in Rhode Island. No such

expression exists with regard to out-of-state dealers selling

cars in another state. The absence of any specification that

"new motor vehicle dealers" can include "nonresidents" confirms

RIDOT's interpretation of R.I. Gen. Laws 31-5.1-4.2 as

-14-

excluding Fireside from the new dealership hearings.

Now that we have determined that Rhode Island's new

dealership law applies only to in-state dealers, we can proceed

to the task of determining whether RIDOT's action of excluding

Fireside from the new dealership hearings was a constitutional

exercise of state power.

A. Commerce Clause

The Commerce Clause, while literally a grant of power

to Congress, also restricts states from passing laws that

interfere with interstate commerce. Wyoming v. Oklahoma, 112 S.

Ct. 789, 800 (1992); New Energy Co. v. Limbach, 486 U.S. 269, 273

(1988). "This 'negative' aspect of the Commerce Clause prohibits

economic protectionism -- that is, regulatory measures designed

to benefit in-state economic interests by burdening out-of-state

competitors." New Energy, 486 U.S. at 273-74; see also Hyde Park

Partners, L.P. v. Connolly, 839 F.2d 837, 843 (1st Cir. 1988).

Laws that have either the purpose or effect of

discriminating against interstate commerce will be struck down as

unconstitutional unless the state can establish that there is no

reasonable alternative method of safeguarding a legitimate local

interest. Wyoming v. Oklahoma, 112 S. Ct. at 800; New Energy,

486 U.S. at 274; Maine v. Taylor, 477 U.S. 131, 138 (1986)

(citing Hughes v. Oklahoma, 441 U.S. 322, 336 (1979)). State

laws which have as their primary or exclusive purpose the

promotion of local interests by burdening out-of-state commerce,

that is, economic protectionism, are subject to a virtual "per se

-15-

rule of invalidity." Wyoming v. Oklahoma, 112 S. Ct. at 800

(quoting Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978)).

In the absence of discrimination, state action that

interferes with or burdens interstate commerce will be struck

down if the local interest is not very substantial or if the

burdens imposed on interstate commerce are excessive in relation

to the putative benefits of the state's action. Maine v. Taylor,

477 U.S. at 138; Brown-Forman Distillers Corp. v. New York State

Liquor Auth., 476 U.S. 573, 579 (1986); Pike v. Bruce Church,

Inc., 397 U.S. 137, 142 (1970); Hyde Park, 839 F.2d at 844-45.

Thus, when a state law regulates in-state and out-of-state

businesses evenhandedly, courts should apply "less strict

scrutiny" or a more lenient balancing test than they would apply

in the case of discrimination against interstate commerce.

Wyoming v. Oklahoma, 112 S. Ct. at 800 n.12; Brown-Forman, 476

U.S. at 579; Philadelphia v. New Jersey, 437 U.S. at 624.

1. Discrimination Against Interstate Commerce

R.I. Gen. Laws 31-5.1-4.2 does not have the purpose

of discriminating against interstate commerce. As discussed

above, R.I. Gen. Laws 31-5.1 is designed to regulate automobile

dealerships in the state of Rhode Island, and R.I. Gen. Laws

31-5.1-4.2, in particular, is designed to insure that certain

conditions are met before a new dealership license is granted.

Rhode Island's intent is to protect Rhode Island consumers and

Rhode Island dealers from certain franchising practices of

automobile manufacturers which are perceived as harmful to the

-16-

local community. R.I. Gen. Laws 31-5.1-4.2 is not designed to

promote local dealers at the expense of out-of-state dealers nor

to alter the terms at which dealers sell, or consumers purchase,

cars within or outside of Rhode Island.

In addition, the exclusion from licensing hearings of

out-of-state but not in-state dealers within a given area is not

facially discriminatory against interstate commerce such that "on

its face [it] appears to violate the cardinal requirement of

nondiscrimination." New Energy, 486 U.S. at 274; Healy v. The

Beer Institute, 491 U.S. 324, 340-41 (1989). R.I. Gen. Laws

31-5.1-4.2 is strictly concerned with licensing dealerships in

Rhode Island; it does not, on its face, regulate any aspect of

interstate commerce such as the flow of goods across borders, the

sale of out-of-state goods, the comparative cost of making or

selling those goods, or any other aspect of the commercial

activity of out-of-state businesses. Exxon Corp. v. Governor of

Maryland, 437 U.S. 117, 126 (1978) (noting that a Maryland law

prohibiting producers and refiners of petroleum products from

operating retail service stations within the state was

distinguishable from laws discriminating against interstate

commerce because the law "creates no barriers whatsoever against

interstate independent dealers; it does not prohibit the flow of

interstate goods, place added costs upon them, or distinguish

between in-state and out-of-state companies in the retail

market"). Because Rhode Island's new car dealership law does not

facially apply to interstate commerce, it cannot facially

-17-

discriminate against interstate commerce.

We therefore turn to the alleged discriminatory effect

of Rhode Island's new dealership law. R.I. Gen. Laws 31-5.1-

4.2 does not place burdens on goods or services from out-of-state

or on the out-of-state businesses that produce them. The statute

concerns the rights and obligations of licensed Rhode Island

dealerships, a group that does not include Fireside. It simply

has no application whatsoever to Fireside. The statute in no way

hinders Fireside's ability to sell cars to Rhode Islanders; nor

does it increase Fireside's cost of doing business with Rhode

Island. These facts distinguish Rhode Island's statute from

those statutes which the Supreme Court has commonly struck down

because of their discriminatory effects. See, e.g., Healy, 491

U.S. at 337-40 (striking down Connecticut statute requiring beer

shippers to affirm that their prices are no higher than prices in

bordering states because the statute affected prices outside of

the state); Hughes v. Oklahoma, 441 U.S. 322, 336-38 (1979)

(striking down Oklahoma statute prohibiting the sale of minnows

outside of the state because it blocked the flow of commerce

through state borders); Philadelphia v. New Jersey, 437 U.S. at

625-28 (striking down New Jersey law prohibiting the shipment of

garbage into the state for the same reason); Hunt v. Washington

State Apple Advertising Comm'n, 432 U.S. 333, 349-352 (1977)

(striking down North Carolina law that restricted grade

identifications on closed apple containers, including the

favorable grade for Washington apples, because the law raised the

-18-

cost of doing business in North Carolina for Washington apple

growers and stripped away the competitive advantage of the

Washington apple industry). Rhode Island's law clearly does not

have the effect of burdening out-of-state businesses.

Instead, this case falls into the "local benefit" or

"subsidy" category of cases -- that is, cases dealing with state

laws that confer a benefit on businesses within the state while

withholding the benefit from similarly situated out-of-state

businesses. Fireside claims that R.I. Gen. Laws 31-5.1-4.2

grants to Rhode Island dealerships the privilege of protesting

the establishment of new car dealerships at locations close to

their existing dealerships, thus allowing them an opportunity to

limit their competition. At the same time, Fireside argues, R.I.

Gen. Laws 31-5.1-4.2 denies the same privilege to out-of-state

dealers in the same competitive area. The result of such

discriminatory effects, Fireside alleges, is to drive the

establishment of new car dealerships out towards Rhode Island's

borders where they can divert businesses from dealers in

neighboring states who have no standing to protest the

establishment of such dealerships at a good-cause hearing.

Supreme Court jurisprudence on discriminatory

privileges for in-state business under the Commerce Clause is,

unfortunately, somewhat inconsistent. On the one hand, several

state laws designed to promote local industry have been struck

down by the Court. E.g., Wyoming v. Oklahoma, 112 S. Ct. at 800

(striking down Oklahoma law reserving a segment of the Oklahoma

-19-

coal market for Oklahoma-mined coal); New Energy, 486 U.S. at

273-80 (striking down Ohio tax credit for ethanol produced in the

state); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984)

(striking down Hawaiian law exempting local producers of certain

liquors from general liquor tax). On the other hand, the Court

has repeatedly affirmed the long-recognized proposition that

states may directly subsidize local industry as long as they do

so without burdening the ability of interstate competitors to

sell their products in the state. New Energy, 486 U.S. at 278;

Bacchus, 468 U.S. at 271; Hughes v. Alexandria Scrap Corp., 426

U.S. 794, 814-17 (1976) (Stevens., J., concurring);4 see also

West Lynn Creamery, Inc. v. Healy, 62 U.S.L.W. 4518, 4525 (June

17, 1994) (Scalia, J., concurring) (describing this area of the

Court's Commerce Clause jurisprudence as a "quagmire"). As

Justice Scalia stated in New Energy:

The Commerce Clause does not prohibit all
state action designed to give its
residents an advantage in the
marketplace, but only action of that
description in connection with the

State's regulation of interstate

commerce. Direct subsidization of

domestic industry does not ordinarily run
afoul of that prohibition; discriminatory
taxation of out-of-state manufacturers

4 Although the majority decided Alexandria Scrap according to

what has become known as the "market participant" doctrine --
i.e., normal Commerce Clause scrutiny does not apply when the
state enters the market as a buyer, seller, or employer to favor
local citizens, Alexandria Scrap, 426 U.S. at 805-10 -- the

majority also placed some emphasis on the fact that Maryland's
beneficial treatment of only in-state businesses, while affecting
the flow of interstate commerce, did not "interfere[] with the
natural functioning of the interstate market either through
prohibition or through burdensome regulation." Id. at 806.

-20-

does.

New Energy, 486 U.S. at 278 (emphasis in original).

Although we see no practical difference between the tax

break offered to local liquor producers in Bacchus, for example,

and a "direct" cash subsidy to those same industries (thus

blurring the imaginary line between discriminatory privileges

that burden interstate commerce and those that do not), the

Court's focus on laws "in connection with the State's regulation

of interstate commerce" appears to invoke the Commerce Clause

only where the challenged law relates to taxes, prices, or the

conditions and costs imposed on an out-state-business doing

business in the state. See Exxon Corp., 437 U.S. at 126; West

Lynn Creamery, 62 U.S.L.W. at 4520-22.

R.I. Gen. Laws 31-5.1-4.2 does bestow the benefit of

protesting new dealerships on existing Rhode Island dealers in a

competitive area which is not simultaneously extended to Fireside

or other out-of-state dealers who are also in the competitive

area. This "advantage in the marketplace," however, is not one

"in connection with the state's regulation of interstate

commerce." New Energy, 486 U.S. at 278. The creation of new car

dealerships in Rhode Island does not relate to the price of the

automobiles being sold, the taxes paid for them, or the costs and

conditions of selling them. Moreover, Rhode Island's procedure

for protesting new dealerships does not diminish the

opportunities for Massachusetts dealers to sell cars to Rhode

Island customers. Rhode Island's efforts to license and regulate

-21-

in-state dealers is thus far afield from protectionist laws that

serve to enhance economic prosperity of local citizens by

hindering the free flow of products or by affording privileges

provided at the expense of out-of-state businesses.

Fireside claims that denying it the protest privilege

provided by R.I. Gen. Laws 31-5.1-4.2 will have a differential

effect on the number of competitors a given car dealership will

face, ultimately reducing the number of Rhode Islanders who will

travel to Massachusetts to buy shiny new Nissan 380-Z's. This

diversionary effect is present in all subsidy cases and, thus,

cannot by itself establish a violation of the Commerce Clause.

In this case, the diversion of business does not result from a

comparative advantage in the marketplace created by the

challenged state action that would not normally exist in a free

market for new car sales. Consequently, this case does not

involve a practice that even comes close to the types of local

subsidies that raise Commerce Clause concerns. See Hunt v.

Washington State Apple, 432 U.S. at 351-52 (striking down North

Carolina law because it stripped away advantages that out-of-

state competitor would normally have in the free market); Hyde

Park, 839 F.2d at 843 ("state action must not 'neutralize the

economic consequences of free trade among the states'") (quoting

Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 526 (1935)).

The mere act of granting a dealership license that

might not otherwise be granted had out-of-state dealers been

allowed to protest at the hearing does not mean that the new

-22-

dealership will have some preferential ability to sell cars to

Rhode Island customers. Similarly, nothing in R.I. Gen. Laws

31-5.1-4.2 affects Fireside's ability to sell a shinier Nissan at

a better price, and a Rhode Islander's ability to take advantage

of such bargains. The effect of the law is not to dictate the

terms of competition between businesses, but rather, to regulate

the existence of competitors. Given these circumstances, the

fact that some theoretical group of Rhode Island dealers in the

interior of the state face less competition from new dealerships

allegedly concentrated on the border is not significant for

purposes of a Commerce Clause analysis. The alleged beneficial

effect of R.I. Gen. Laws 31-5.1-4.2 is too far afield from the

protectionism that the Commerce Clause prohibits.

This case is distinguishable from the Bendix case

relied on by Fireside for the proposition that the withholding of

"legal defenses or like privileges" from out-of-state businesses

discriminates against interstate commerce. Bendix Autolite Corp.

v. Midwesco Enters., Inc., 486 U.S. 888, 893 (1988). In Bendix,

the Supreme Court struck down an Ohio statute that tolled the

statute of limitations (i.e. suspended the running of time) on

fraud and breach of contract actions for any foreign business

that was not "present" in the state and had not designated an

agent for service of process. Id. To begin with, the Supreme

Court never determined whether or not the Ohio statute

discriminated against interstate commerce. Id. at 891. Instead,

the Court based its finding on a balancing of the burdens of the

-23-

law with the justifications for the law. Id. In any event,

Bendix is not applicable to the present case for a number of

reasons.

First, the Bendix Court found that the Ohio statute

places a "significant burden" on out-of-state businesses because

it "forces a foreign corporation to choose between exposure to

the general jurisdiction of Ohio courts or forfeiture of the

limitations defense, remaining subject to suit in Ohio in

perpetuity." Id. at 893. The statute thus affected the costs

and conditions of doing business in the state relative to local

businesses.

As already noted, that is not the case here. Fireside

does not face any increased liability, or other burden that would

increase its cost of doing business, by virtue of its exclusion

from the licensing hearings. The only effect of R.I. Gen. Laws

31-5.1-4.2 on Fireside is a relative limitation on its ability

to restrict the number of competitors it will face, an interest

beyond the purview of the Commerce Clause. Legal defenses in

contract or fraud actions are simply not comparable to

participation in a local hearing for the granting of a state

dealership license to a completely different party. The former

involves "an integral part of the legal system . . . relied upon

to project the liabilities of persons and corporations active in

the commercial sphere." Id. The latter involves local licensing

proceedings that have nothing to do with the out-of-state

business beyond its concern over the creation of a competitor.

-24-

Furthermore, the alleged protest right in this case,

unlike the statute of limitations defense in Bendix, is not part

of a statutory scheme that applies to out-of-state businesses.

As discussed above, R.I. Gen. Laws 31-5.1-4.2 is concerned with

local licenses and simply has no application to Fireside. The

statute of limitations defense, however, is a part of the general

scheme of civil commercial liability that applies to all

companies with minimum contacts to the state. The Ohio statute

was thus purposefully directed to out-of-state businesses to

revoke a procedural defense they would normally enjoy. In the

present case, no benefit was revoked or withheld from out-of-

state parties because R.I. Gen. Laws 31-5.1-4.2 was concerned

solely with local dealership licensing and was never intended to

afford any benefits to out-of-state dealers in the first place.

2. Impermissible Burdening of Interstate Commerce

Because we find no discriminatory purpose or effect on

interstate commerce from R.I. Gen. Laws 31-5.1-4.2, we must

apply the more lenient Pike balancing test to determine whether

the law imposes an unreasonable burden on interstate commerce.

Laws that have only an incidental impact on interstate commerce

will be upheld so long as the burden imposed on interstate

commerce is not clearly excessive in relation to the putative

benefits. Brown-Forman, 476 U.S. at 579; Philadelphia v. New

Jersey, 437 U.S. at 623-24; Pike, 397 U.S. at 142. "'[T]here is

a residuum of power in the state to make laws governing matters

of local concern which nevertheless in some measure affect

-25-

interstate commerce or even, to some extent, regulate it.'"

Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 669

(1981) (quoting Southern Pacific Co. v. Arizona, 325 U.S. 761,

767 (1945)).

R.I. Gen. Laws 31-5.1-4.2 burdens interstate commerce

only minimally, if at all. As discussed above, no burdens are

placed on an out-of-state dealer's ability to sell cars to Rhode

Islanders. The only effect on interstate commerce, theoretically

anyway, appears to be a decrease in the number of Rhode Island

customers who go to Massachusetts to buy Nissans because out-of-

state dealers are not able to protest the establishment of new

Rhode Island dealerships near the border. This diversionary

effect, however, attributable to increased competition from

competitors who gain no special competitive advantage from the

state action, does not implicate the Commerce Clause. The free

flow of goods remains unaffected by R.I. Gen. Laws 31-5.1-4.2

and any changes in that flow are due solely to consumers acting

within the free market. See Minnesota v. Clover Leaf Creamery

Co., 449 U.S. 456, 473-74 (1981) (upholding Minnesota law banning

the use of plastic milk containers even though the statute

benefitted the predominantly local pulpwood producers at the

expense of the predominantly out-of-state plastics industry);

Exxon Corp., 437 U.S. at 126-28 (upholding Maryland statute

prohibiting producers and refiners of petroleum products from

operating retail service stations within the state partly because

"in-state independent dealers will have no competitive advantage

-26-

over out-of-state dealers").

Given the lack of any significant burden on interstate

commerce in this case, we find Rhode Island's interest in

excluding out-of-state parties from participating in a matter of

strictly local concern -- the licensing of Rhode Island

dealerships -- more than sufficient to pass Constitutional muster

under the Pike balancing test. Certainly the state's desire to

protect local dealers and consumers from harmful franchising

practices is a lawful legislative goal. Even if we confine our

analysis to state interests that are directly tied to the

restriction on who can participate in hearings, however, the

statute survives the balancing test. Rhode Island's concerns for

administrative convenience and the reasonable belief that state

citizens are best qualified to represent local interests

sufficiently justify the state's exclusion of out-of-state

dealers from the new dealership hearings.

B. Other Constitutional Claims

1. Due Process

Fireside claims that RIDOT's exclusion of Fireside from

new dealership hearings deprived it of a protected property

interest without procedural due process. The district court

rejected this claim, finding that Fireside had no protectable

interest in pursuing its business free from competition. On

appeal, Fireside argues that it has a protected property interest

in the form of a legitimate claim of entitlement to be free from

"excessive intrabrand competition" in the market for new Nissans.

-27-

Fireside maintains that R.I. Gen. Laws 31-5.1-4.2 granted this

interest to Fireside when it bestowed protest rights on all

dealers within the "relevant market area" and that RIDOT then

deprived Fireside of this right when it excluded Fireside from

the hearings.

The protections of procedural due process are not

triggered unless Fireside can show it has been deprived of a

protectable liberty or property interest. Cleveland Bd. of Educ.

v. Loudermill, 470 U.S. 532, 538 (1985); Board of Regents v.

Roth, 408 U.S. 564, 569 (1972). Property interests "'are created

and their dimensions are defined by existing rules or

understandings that stem from an independent source such as state

law.'" Loudermill, 470 U.S. at 538 (quoting Roth, 408 U.S. at

577).

Fireside does not have a protectable property interest

in being free from excessive intrabrand competition or from

participating in Rhode Island's new dealership hearings because

R.I. Gen. Laws 31-5.1-4.2 does not confer any protections or

rights of participation on out-of-state dealers. As we have

already found, Rhode Island's dealership licensing statute only

applies to dealerships within the state of Rhode Island and does

not have, nor has it ever had, any application to out-of-state

dealers like Fireside. Consequently, RIDOT did not deprive

Fireside of any existing property interest when it excluded

Fireside from its hearing on the establishment of Smithfield

Nissan. The district court correctly found no due process

-28-

violation in this case.

2. Equal Protection

Fireside finally claims that RIDOT's exclusion of

similarly situated out-of-state dealers from new dealership

hearings is an impermissible classification under the Equal

Protection Clause of the Constitution.

Absent a suspect classification or a fundamental right,

courts will uphold economic and social legislation that

distinguishes between two similarly situated groups as long as

the classification is rationally related to a legitimate

government objective. Nordlinger v. Hahn, 112 S. Ct. 2326, 2331-

32 (1992); Schweiker v. Wilson, 450 U.S. 221, 230 (1981);

Dandridge v. Williams, 397 U.S. 471, 485 (1970); LCM Enterprises,

Inc. v. Town of Dartmouth, 14 F.3d 675, 678-79 (1st Cir. 1994).

A state statute will survive this "rational basis" scrutiny under

the Equal Protection Clause as long as "any state of facts

reasonably may be conceived to justify it." Dandridge, 397 U.S.

at 485 (quoting McGowan v. Maryland, 366 U.S. 420, 426 (1961));

accord LCM Enters., 14 F.3d at 679 (collecting cases). A state's

classification is not unconstitutional simply because it "'is not

made with mathematical nicety or because in practice it results

in some inequality.'" Dandridge, 397 U.S. at 485 (quoting

Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911)).

Fireside claims that RIDOT's application of R.I. Gen.

Laws 31-5.1-4.2 is not rationally related to the stated goal of

protecting Rhode Island consumers and Rhode Island dealerships

-29-

from certain franchising practices of automobile manufacturers.

Fireside argues that excluding out-of-state dealers from the

good-cause hearings not only fails to further the goals of

protecting consumers and dealers but actually undermines those

goals. According to Fireside, its exclusion from the hearings

gives Rhode Island regulators a distorted view of the "relevant

market area" by understating the existing competition among

automobile franchises, resulting in licensing decisions that are

detrimental to Rhode Island consumers and dealers. The only

purpose for excluding out-of-state dealers, Fireside posits, is

the illegitimate one of economic protectionism.

We disagree with Fireside's contention that RIDOT's

exclusion of Fireside bears no rational relationship to the goal

of protecting Rhode Island consumers and car dealers. Excluding

out-of-state parties from hearings on matters of strictly local

concern is a reasonable way to conduct state governmental

business. We find it reasonable for Rhode Island to believe,

rightly or wrongly, that members of its own community are best

qualified to represent community interests to regulators,

including interests concerning the effect of a manufacturer's

efforts to establish a new dealership on existing dealers and

consumers. Out-of-state parties may be more likely to have

interests that conflict with local interests. Further, Rhode

Island's interest in administrative convenience may justify its

decision to cut off the number of people participating in state

decisionmaking at the logical point of state citizenship.

-30-

Whether more information concerning out-of-state dealers would

better serve Rhode Island's goal of protecting consumers and

dealers is irrelevant for purposes of rational basis analysis

under the Equal Protection Clause. In any event, we are

skeptical of the proposition that Rhode Island consumers and

dealers are unable to fully represent their own interests at a

hearing without the participation of out-of-state dealers. If an

existing Rhode Island dealer or a consumer group finds it in

their interest to present information about other out-of-state

dealerships, nothing in the law prevents them from doing so.

Finally, we find that Rhode Island did not purposefully

discriminate against Fireside by excluding it from new dealership

hearings for the sole purpose of furthering the illegitimate goal

of economic protectionism. See Snowden v. Hughes, 321 U.S. 1, 8

(1944). As already discussed above, R.I. Gen. Laws 31-5.1-4.2

was designed and intended to regulate and protect licensed car

dealerships in Rhode Island and was not intended nor designed to

benefit local businesses at the expense of out-of-state

competitors. We therefore uphold the district court's holding

that RIDOT did not violate Fireside's constitutional rights.

Affirmed.

-31-